UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

OPTICAL WORKS AND LOGISTICS,
LLC,
    Plaintiff,

v.

SENTINEL INSURANCE COMPANY,
LIMITED and THE HARTFORD
INSURANCE GROUP,
    Defendant.

C.A. No. 15-163-JJM-LDA

## MEMORANDUM AND ORDER

**JOHN J. MCCONNELL, JR., Chief United States District Judge.**

A perfect storm of storms in Rhode Island in late summer of 2011 caused massive damage across the state. A fledging manufacturing replication business, Optical Works and Logistics, LLC ("OWL"), suffered losses due to the storm. OWL made a claim to Sentinel Insurance Company, Limited and the Hartford Insurance Group's ("Hartford") under its all-risk insurance policy; Hartford denied the claim and OWL was unable to recover and continue its operations. This lawsuit followed and now that extensive discovery has been taken, Hartford moves for summary judgment.[1] ECF No. 40.

---

[1] The Court asked the parties to supplement the motion papers in this case; both sides filed such motions. ECF Nos. 54, 55. Hartford moves to strike OWL's supplemental memorandum, arguing that it essentially filed a sur-reply that was not permitted by Court order. ECF No. 56. The Court sought additional argument and evidence to supplement what was potentially stale briefing. It believes that it received helpful memorandum from both parties. Hartford's Motion to Strike is DENIED.

This case is not about the applicability of any policy exclusion–Hartford denied coverage because it says there were no covered damages to OWL's property and business. The question of whether OWL was entitled to coverage is one of fact and there are substantial disputes in the record such that summary judgment is impossible. In light of the determination that these significant issues of disputed material fact in this case are better left for a trier-of-fact to decide, Hartford's motion is DENIED. The Court will provide its reasoning below after a brief recitation of the facts.

I. FACTS AND BACKGROUND

OWL was in the business of supply-chain management services and replication of optical media such as DVDs and CDs for education and healthcare markets. The process requires expensive, specialized machinery and ultra-sensitive equipment that are highly technical and dangerous to operate. They are sensitive to water, dust, and pollutants. In planning to get the business rolling, OWL designed a "clean room" and found a property at 320 Narragansett Park Drive in Rumford, Rhode Island that was suitable to build out to its specifications. It incurred construction charges and rent, some of which went unpaid as the business attempted to gain footing. OWL moved into the property and set up its operations in January 2011. OWL purchased an all-risk property and business interruption insurance policy from Hartford. That policy was intended to cover OWL's continuing normal operating expenses incurred, physical damage to business personal property, extra business expenses incurred, and damage to valuable papers, computer, and media in the event of a covered event.

D.J. Matthews and Michael Fullam were principals of OWL. OWL began its replication work in July and August 2011. OWL had two full time employees (one was Mr. Matthews), one contracting, and one temporary employee. Mr. Fullam was doing part time sales. About a month later, Hurricane Irene made landfall in Rhode Island. Tropical Storm Lee quickly followed, ending around September 8, 2011. Mr. Matthews remained in the building during Tropical Storm Lee and observed water pouring through the roof and walls. The water damaged business documents, a laptop computer, and infiltrated the "clean room," damaging some of the replication equipment. It pooled throughout the space. The presence of water in the building led OWL to immediately attempt to mitigate its circumstances. It cleaned up the pools of water and protected its equipment as much as possible.

OWL asserts that it notified Hartford almost immediately; Hartford says this initial contact was to submit a change of address and it only truly got notice more than three weeks after the first storm. Mr. Matthews also looped in OWL's insurance brokers from Capstone Insurance.

The storms severely damaged the roof of the building. A roofing company was engaged to make repairs, but it continued to leak despite those efforts and the landlord was unwilling to completely replace it. OWL had not yet heard from Hartford but decided that it was critical that the equipment be moved out of the damp environment. OWL hired Demers Trucking, who moved and stored the equipment off site. OWL also determined that it needed to move its business to a new location because the building conditions were no longer optimal.

In early October 2011, Hartford insurance adjuster John Perry met with Mr. Matthews at the building. He spent between fifteen to thirty minutes viewing the property. Because the equipment was off site, he did not examine it. Nor did he look at the roof. He requested documents and information to assist in making the investigation. Mr. Perry issued a reservation of rights letter informing OWL that it was investigating coverage issues, including late notice, what caused the water damage, and whether OWL needed to leave the property.

Hartford also hired three consultants on engineering, technology, and roofing in order to determine the cause of the loss. Ken Burdulis was to examine the equipment and advise OWL about whether it needed to relocate. OWL takes issue with Mr. Burdulis's qualifications to do so and raises credibility issues in light of their view of his unprofessional and inadequate inspections. Mr. Burdulis told OWL that it was right to leave the building but concluded the opposite in his report. He said he did not observe significant water damage and found that OWL's equipment was not damaged. He also found that the "clean room" would not be certifiable as such because the walls were porous and there was no gowning area. John Burke, Hartford's expert who focused on the roof, also told OWL that the storm caused damage to the roof, but officially reported to Hartford that the storm did not damage the roof. Mr. Burke observed nail holes, poor flashing, defective seam repairs, and other evidence of poor repairs. Hartford's final consultant, Dr. Roger Ruggles reported that water came through the roof and walls in small amounts and that witnesses observed water coming out of one wall for four days after the storm.

In early October, Hartford requested documents from OWL in support of its claim, to which OWL struggled to respond because documents containing this information were damaged by the storm. OWL alleges that this is the last time it heard from Mr. Perry. Hartford avers that it was in constant contact with OWL's insurance brokers about its investigation. William Coady from Capstone told Mr. Perry that Mr. Matthew's computer was broken so he needed to get the documents elsewhere. OWL attempted to recreate the lost documents and information Mr. Perry sought but was not able to do so before Hartford issued its denial letter in December. The letter relied on Mr. Burdulis's investigation report and did not reference Hartford's other consultants. Hartford denied coverage based on its conclusion that the equipment was not water damaged and OWL did not have to move out of the building.

OWL estimated that its losses could have been between $50,000 and $75,000 assuming that Hartford quickly provided coverage so that it could move, retrieve its equipment, and get it back up and running again. The fact that Hartford denied the coverage foreclosed all hope that the business could survive. Now, OWL claims over $4 million of losses for operating expenses, extended business income, equipment loss, extra expenses, and loss of valuable papers and documents. Faced with insolvency, OWL filed this lawsuit for breach of contract and bad faith, alleging among other things that Hartford failed to communicate its no-coverage position for a month,

assigning an unqualified adjuster, and failed to tell OWL what was covered.[2] Hartford now moves for summary judgment.

## II. STANDARD OF REVIEW

When making a summary judgment determination, the Court must review the entire record and consider the facts and inferences in the light most favorable to the nonmoving party. *Cont'l Cas. Co. v. Canadian Univ. Ins. Co.*, 924 F.2d 370, 373 (1st Cir. 1991).

Federal Rule of Civil Procedure 56 governs the summary judgment process. Rule 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." A party is entitled to summary judgment only if two conditions specified in Rule 56 are met: that "no genuine dispute [exists] as to any material fact" and that the undisputed facts demonstrate that the party is "entitled to judgment as a matter of law." *See Knight v. Mills*, 836 F.2d 659, 664 (1st Cir. 1987) (undisputed material facts, together with inferences drawn against the movant, "must lead to one reasonable conclusion in favor of the movant" to justify summary judgment). A material fact is one that "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or

---

[2] Hartford's argument that OWL cannot maintain this suit because its corporate status was revoked on August 1, 2012 and it filed this suit two years later when it was inactive fails. The state statute it cites, R.I. Gen. Laws § 7-1.2-1324, applies only to corporations. Because OWL is not a corporation, but a limited liability company, this section does not bar OWL's suit.

unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is a drastic remedy, *Colman v. Faucher*, 128 F. Supp. 3d 487, 490 (D.R.I. 2015), because it deprives the parties of the opportunity to have a trier-of-fact determine the outcome as enshrined in the Seventh Amendment to the United States Constitution ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...."). This is especially true in fact-intense inquiries. Thus, the law requires the Court to draw all reasonable inferences against the moving party and that the Court grant summary judgment if the undisputed facts and inferences that flow from them allow for only one reasonable conclusion in favor of the movant. *Knight*, 836 F.2d at 664 (citing *Anderson*, 477 U.S. at 251). This Court must "tak[e] the facts in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Barraford v. T & N Ltd.*, 778 F.3d 258, 263 (1st Cir. 2015).

## III. DISCUSSION

In this case, OWL has the burden to establish that it was covered under the Hartford policy. It has to prove "(1) that it has incurred liability for damages; (2) that the damages arise from property damage; and (3) that the property damage was caused by an occurrence." *Providence Journal Co. v. Travelers Indem. Co.*, 938 F. Supp. 1066, 1073 (D.R.I. 1996). Hartford argues that it is entitled to summary judgment because it is undisputed that OWL did not suffer any covered claims. OWL argues that Hartford did breach the contract when it denied the claim, but in any

event, summary judgment should be denied because the evidence produced in discovery and its experts' opinions demonstrate that there are disputes about whether the storm damage did result in covered claims.

### A. Breach of Contract

There is no dispute that Hartford denied OWL's property damage claim after the storms made it impossible for it to resume its business operation. The purpose of business interruption coverage is to ensure that a business has "the financial support necessary to sustain its business operation in the event disaster occurred." *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 194 (2008); *see Howard Stores Corp. v. Foremost Ins. Co.*, 82 A.D.2d 398, 400, 441 N.Y.S.2d 674 (1st Dept. 1981) ("The purpose of business interruption insurance is to indemnify the insured against losses arising from inability to continue normal business operation and functions due to the damage sustained as a result of the hazard insured against"). This coverage is particularly useful when a natural disaster occurs because many businesses "lack the resources to continue business operations without insurance proceeds." *Bi-Econ. Mkt., Inc.*, 10 N.Y.3d at 195.

Pursuant to the terms of the insurance policy, OWL had coverage for its 1) "continuing normal operating expenses incurred" after and due to a covered cause of loss, 2) physical damage to business personal property, 3) extra business expenses incurred as a result of a covered loss and 4) damage to valuable papers, computers, and media. The policy provides business interruption coverage during the so-called period of restoration, which is defined in the policy as beginning with the date of the

direct physical loss or physical damage and ending on the date when the property at the scheduled premises should be repaired, rebuilt, or replaced with reasonable speed and similar quality or the date the business is resumed at a new permanent location. In this case, this period is a period of up to twelve months plus an extra 120 days by applying Extended Business Income coverage under the policy.

The Court has determined that there are disputed material facts here such that a trier-of-fact should decide the merits of OWL's breach of contract claim at trial.[3] Relevant to a breach consideration is how the parties handled the investigation and claim process. OWL presented fact and opinion evidence in support of its claim that Hartford failed to fulfill its duty to properly investigate; for example, OWL takes shots at the investigators' qualifications, thoroughness, and adequacy and fairness of their reports. Hartford disputes this evidence with its own view of the quality of the investigation. Furthermore, Hartford counters that OWL did not make a proper claim as required under the policy so it could not properly respond and/or it did not have all the information necessary to process the claim.[4] There are many disputed

---

[3] As is common to most insurance coverage cases, this is a factually intense case. The parties have extensively briefed these issues, with over two hundred pages of well-argued facts and legal arguments. Because the Court has determined that this case will go to trial, it will not list all of the factual issues the parties have identified. In including some issues as exemplars, the Court by no means intends to place weight or judgment on any of the issues highlighted in this Order.

[4] Some of these disputes stem from issues OWL had in producing documents and evidence of its losses to Hartford investigators after the storms. Hartford legitimately objects to some of the expenses OWL now seeks because OWL did not present them post-storm. In response, OWL argues that it was hamstrung from producing such documents and proof because of the storm damage. By the time it was ready to turn over some of the information, Hartford had already denied its

9

issues on this question and disputes over whether an insured cooperated in a claims investigation is usually a question of fact for the trier-of-fact. *IDC Props., Inc. v. Chicago Title Ins. Co.*, 974 F. Supp. 2d 87, 108 (D.R.I. 2013)

Next, Hartford argues that it did not breach the contract because OWL had no proof of continuing normal operating expenses. Hartford raises many factual assertions relating to OWL's viability as an ongoing business concern. For example, Hartford argues that OWL was new to production, had few paid employees, and was late paying its rent and utilities as evidence that OWL had no potential leading up to the 2011 storms. Hartford argues that there is no evidence that OWL actually incurred any expenses before the storms such as salary, benefits, security, cleaning or accounting services, travel or conference expenses, rent or utilities so it is not entitled to coverage for continuing operating expenses.

There are disputed issues of fact here. OWL admits that it did not actually incur any of the claimed continuing expenses after the storms but argues that Hartford's refusal to provide coverage caused OWL to shut down its business. Its consulting expert projects what it would have incurred if it had successfully continued to operate after receiving the benefits under the all-risk policy. If the Court draws inferences in OWL's favor, as it is required to do on Hartford's summary judgment motion, a reasonable trier-of-fact could very well find that OWL could have resumed normal business activities at some point if Hartford had not wrongfully denied the

---

claim. Hartford gave OWL an opportunity to supplement its documents post-denial, but OWL did not do so and instead filed this suit.

claim. Determining exactly when and whether OWL could have resumed normal business operations is the type of murky factual question properly resolved by a trier-of-fact.

Moving beyond the issue of entitlement to coverage, a significant dispute arose over whether and what property was damaged. Was OWL's machinery damaged merely by being exposed to water or did the water have to penetrate the machines to cause damage? The manuals indicate that mere exposure to water is dangerous, but Hartford's investigation concluded the opposite. When Hartford investigator Mr. Burdulis looked at the equipment, he observed that it was covered in dust and rust consistent with seven-year-old equipment, refuting Mr. Matthew's water damage claim. Hartford also claims that OWL lost the equipment because it did not pay the moving and storage charges, not because of the storms and it has no losses because it has not replaced the equipment or established the covered value. OWL did produce a document that shows that it paid $100k for the used equipment.

There are disputes stemming from fact and expert witness testimony as well. For example, the parties' experts dispute what caused the water to enter the property—Hartford's expert says the roof was in disrepair before the storms so the storms could not be responsible for the water damage; OWL's argues that the roof was almost perfect before the storms and its experts opine that the damage was storm related. There are disputes about what operating expenses such as rent and utilities were incurred and what extra expenses were incurred. OWL has submitted evidence by way of its expert David Duffus and through discovery answers, indicating how

much money it would need to replace business property, computers, valuable papers, and records. Moreover, Mr. Matthews was an eyewitness to water entering the building and the damage caused. As an OWL principle, he knew about the nature of the replication business and the sensitivity of the equipment involved. Hartford, its investigators, and experts dispute Mr. Matthew's accounts of almost everything. Hartford argues that Mr. Matthew's affidavit contradicts his deposition testimony, but those are exactly the type of credibility assessments that triers-of-fact are vouchsafed to make.

These disputed facts and opinions in the summary judgment record will be vetted through cross-examination and the trier-of-fact will decide which witness testimony is credible and supported by the evidence. The Court is sufficiently convinced that a trier-of-fact should decide the outcome of this case.

### B. BAD FAITH

Hartford argues that OWL's bad faith claim should be dismissed as a matter of law because its actions were reasonable, its interpretation of the policy was reasonable, and its investigation was timely and thorough. OWL objects, relying on its expert's opinions that Hartford did not act according to industry guidelines.

Bad faith is found where an insurer denies coverage or refuses payment for a claim without a reasonable basis, but not when the claim is "fairly debatable." *Skaling v. Aetna Ins. Co.*, 799 A.2d 997, 1010 (R.I. 2002). "[A]n intentional failure on the part of the insurer to determine whether there is a lawful basis to deny the claim, standing alone, is bad faith. This can be established by proof that the insurer 'either

intentionally or recklessly failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review.'" *Id.* at 1011 (citation omitted). "'The appropriate inquiry is whether there is sufficient evidence from which reasonable [minds] could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable.'" *Id.* at 1011 (quoting *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 995 P.2d 276, 280 (2000)); *Beacon Mut. Ins. Co. v. St. Paul Mercury Ins. Co.*, 7 F. Supp. 3d 155, 168 (D.R.I. 2014). "[B]ad faith is established when the proof demonstrates that the insurer denied coverage or refused payment without a reasonable basis in fact or law for the denial." *Skaling*, 799 A.2d at 1010.

This is a close call, but because there are material issues of fact in dispute on the breach of contract claim, the Court denies Hartford's motion on the bad faith claim as well. Hartford presents itself as an insurance company who promptly and professionally investigated OWL's claims. OWL presents fact and expert testimony and documentation that disputes that assertion. The trier-of-fact will have ample evidence to resolve this claim.

## IV. CONCLUSION

The briefing and extensive record in this case raised more questions than answers. After reviewing it all, the Court concludes that a trier-of-fact, not the Court, should be tasked with answering them. The Court finds that OWL has presented competent evidence that Hartford can contest at trial such that summary judgment

is not appropriate. Hartford's motion is DENIED. ECF No. 40. Hartford's Motion to Strike is also DENIED. ECF No. 56.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
Chief Judge
United States District Court

March 26, 2020