UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| OPTICAL WORKS AND LOGISTICS, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>SENTINEL INSURANCE COMPANY, LIMITED and THE HARTFORD INSURANCE GROUP,<br>    Defendants. | C.A. No. 15-163-JJM-LDA |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Chief Judge.

Both parties have filed Motions in Limine. Plaintiff Optical Works and Logistics, LLC ("OWL") filed a Motion in Limine to prevent Defendants Sentinel Insurance Company, Limited and the Hartford Insurance Group ("Hartford") from introducing evidence and arguments at trial in defense of OWL's breach of contract and bad faith claims other than those specifically set forth in Hartford's December 8, 2011 denial letter ("Denial Letter"). ECF No. 62. Hartford filed a Motion in Limine to preclude OWL from introducing certain evidence at trial because it is not relevant to OWL's claims under its insurance policy with Hartford ("The Policy"). ECF No. 63. The Court will address each motion seriatim, after addressing some preliminary matters.

## I.    FACTS AND BACKGROUND

OWL was in the business of supply-chain management services and replication of optical media such as DVDs and CDs for the education and healthcare markets.

The process requires expensive, specialized machinery and ultra-sensitive equipment that are highly technical and dangerous to operate. The equipment is sensitive to water, dust, and pollutants. In planning to get the business rolling, OWL found a property in Rumford, Rhode Island that was suitable to build out to its specifications, including a "clean room." It incurred construction charges and rent, some of which went unpaid as the business tried to gain footing. OWL moved into the property and set up its operations in January 2011.

OWL bought an all-risk property and business interruption insurance Policy from Hartford. That Policy was intended to cover OWL's continuing normal operating expenses incurred, physical damage to business personal property, extra business expenses incurred, and damage to valuable papers, computer, and media in case of a covered event.

In early September 2011, Hurricane Irene and Tropical Storm Lee made landfall in Rhode Island, causing damage to the property, business documents, a laptop computer, and infiltrating the "clean room," damaging some of the replication equipment. The presence of water in the building led OWL to immediately seek to mitigate its circumstances. It cleaned up the pools of water and protected its equipment as much as possible. Because of the damage, OWL decided to move the equipment out of the damp environment. OWL hired a trucking company, who moved and stored the equipment off site. OWL also found that it needed to move its business to a new location because the building conditions were no longer ideal.

2

OWL asserts that it notified Hartford almost immediately; Hartford says this first contact was to submit a change of address and it only got notice of the loss more than three weeks after the first storm. OWL also looped in OWL's insurance brokers from Capstone Insurance. In early October 2011, Hartford insurance adjuster John Perry began his investigation, issuing a reservation of rights letter informing OWL that it was investigating coverage issues, including late notice, what caused the water damage, and whether OWL needed to leave the property.

Hartford requested documents from OWL in support of its claim, to which OWL struggled to respond because the storm damaged documents having this information. OWL tried to recreate the lost documents and information Mr. Perry sought but could not do so before Hartford issued its Denial Letter. Hartford denied coverage based on its conclusion that the equipment was not water damaged and OWL did not need to move out of the building.

OWL estimated that its losses could have been between $50,000 and $75,000 if Hartford had quickly provided coverage so that it could move, retrieve its equipment, and get its company back up and running again. OWL argues that because Hartford denied coverage, it foreclosed all hope that OWL's business could survive. Now, OWL claims over $4 million of losses for operating expenses, Extended Business Income, equipment loss, extra expenses, and loss of valuable papers and documents. Faced with insolvency, OWL filed this lawsuit for breach of contract and bad faith, alleging among other things that Hartford did not communicate its no-

coverage position for a month, assigned an unqualified adjuster, and failed to tell OWL what was covered.

Discovery followed and Hartford filed a Motion for Summary Judgment. The Court denied it, finding that almost every material fact underlying OWL's breach of contract and bad faith claims and Hartford's defenses to those claims was in dispute such that a jury should decide those facts at trial. *Optical Works & Logistics, LLC v. Sentinel Ins. Co., Ltd.*, No. CV 15-163-JJM-LDA, 2020 WL 1480723, at *1–3 (D.R.I. Mar. 26, 2020). Perhaps because these factual disputes prohibited the Court from seeing the forest (ripe legal issues) for the trees (disputed facts), the Court punted at that time on resolving any issues of law concerning policy coverage. On the eve of trial, both parties have filed Motions in Limine, aptly cueing up Policy coverage interpretation issues they advocate should inform whether certain documentary evidence and testimony should be limited at trial.

## II.    INTERPRETATION OF THE POLICY

The law of interpreting insurance policies is well established in Rhode Island.[1] Under Rhode Island law, "when the terms of an insurance policy are found to be clear and unambiguous, judicial construction is at an end. The contract terms must be applied as written and the parties bound by them." *Amica Mut. Ins. Co. v. Streicker*, 583 A.2d 550, 551 (R.I. 1990). In determining whether contract language

---

[1] Because Hartford issued the Policy in Rhode Island to OWL, a Rhode Island corporation, this case is in federal court because of diversity jurisdiction and Rhode Island state substantive law applies. *Rosciti v. Ins. Co. of Penn.*, 659 F.3d 92, 96 (1st Cir. 2011).

4

is clear and unambiguous, a court should interpret "the parties' intent based solely on the written words," and give unambiguous words their "plain and natural meaning." *In re Newport Plaza Assocs.*, 985 F.2d 640, 645 (1st Cir. 1993) (applying Rhode Island law). Contract language is ambiguous where it is "reasonably susceptible of different constructions." *Westinghouse Broad. Co., Inc. v. Dial Media, Inc.*, 122 R.I. 571, 410 A.2d 986, 991 (1980). "[W]hen an insurance contract is ambiguous or subject to more than one reasonable interpretation, it will be strictly construed against the insurer." *Sentry Ins. Co. v. Grenga*, 556 A.2d 998, 999 (R.I. 1989).

Under the Policy, OWL had coverage for its (1) "continuing normal operating expenses incurred" after and due to a Covered Cause of Loss, (2) physical damage to business personal property, (3) extra business expenses incurred because of a covered loss, and (4) damage to valuable papers, computers, and media. The Policy provides business interruption coverage during restoration, which is defined in the Policy as beginning with the date of the direct physical loss or physical damage and ending on the date when the property at the scheduled premises should be repaired, rebuilt, or replaced with reasonable speed and similar quality or the date the business is resumed at a new permanent location. This period is up to twelve months plus an extra 120 days by applying Extended Business Income coverage under the Policy.

## III.   ANALYSIS OF EVIDENTIARY ISSUES

Before turning to the parties' motions, the Court needs to first deal with the issue of bifurcation of the bad faith claim from the breach of contract claim and then

will address an overriding conflict here that undergirds the two Motions in Limine and indeed this entire case.

## A. BAD FAITH CLAIM BIFURCATION

Hartford asks the Court to sever OWL's bad faith claim against it.  Rule 42(b) of the Federal Rules of Civil Procedure allows a court to "order a separate trial of one or more separate issues [or] claims" for "convenience, to avoid prejudice, or to expedite and economize ...."  The Court notes the well-established practice of severing a bad faith claim from a breach of contract claim because a defendant cannot be liable for bad faith if it did not breach the contract.[2]  *Lewis v. Nationwide Mut. Ins. Co.*, 742 A.2d 1207, 1209 (R.I. 2000); *Wolf v. Geico Ins. Co.*, 682 F. Supp. 2d 197, 198 (D.R.I. 2010) ("It has long been held in this state that a bad faith action does not exist until the plaintiff first establishes a breach of contract.").  So, the Court bifurcates these two claims and orders a separate trial of the breach of contract claim, which will be heard first and then, if the jury finds Hartford liable for breach, the trial on the bad faith claim will take place.

## B. BREACH OF CONTRACT EVIDENCE POST-SEVERENCE

Now that the Court has bifurcated the bad faith claim, the sole focus of the Motions in Limine is on what evidence supports the breach of contract claim and its

---

[2] OWL concedes that "[u]nder Rhode Island law, a first-party insured must usually prevail on a breach of contract claim before the trier of fact will consider the merits of a bad faith claim, although this is not an iron-clad rule . . ." ECF No. 62 at 6.

defenses rather than what evidence should be limited to the trial on the bad faith claim.

To prove the breach of contract claim, OWL is limited to the Policy language, the facts underlying coverage availability, and the losses claimed. OWL must first prove that the damages it seeks are covered under the Policy and then prove that the damages amount it claims is due to a Covered Cause of Loss. Neither the insurance company's actions and intent or the insured's actions (in good faith or bad) are relevant to a breach of insurance contract claim.

OWL seeks to present evidence of consequential damages for its economic losses and asserts that these damages are appropriate relief resulting from Hartford's breach of the Policy.[3] Relying on cases in other jurisdictions, OWL advocates that it is entitled to present evidence of consequential damages, but no Rhode Island court has allowed it in a breach of contract claim.[4] Rhode Island does recognize, however, that consequential damages are available if OWL proves its bad faith claim. *Bibeault v. Hanover Ins. Co.*, 417 A.2d 313, 319 (R.I. 1980) ("The duty of an insurer to deal fairly and in good faith with an insured is implied by law. Since violation of this duty sounds in contract as well as in tort, the insured may obtain consequential damages

---

[3] OWL is technically correct that an insurance company's conduct in investigating and denying a claim can support a breach contract claim. But the Rhode Island state courts separate these two types of claims into a breach of contract claim (involving the breach and the damages that represent the correct amount of the claim) and the bad faith claim (involving consequential and other damages that result from the bad faith investigation, actions, and denial of a claim).

[4] A party can commit a material breach of contract unintentionally. *Human Servs. Consultants Ltd. v. Tamule*, No. CV 06-0486ML, 2008 WL 11390850 (D.R.I. June 30, 2008).

for economic loss and emotional distress and, when appropriate, punitive damages."). All other remaining issues and evidence may be appropriate when and if the bad faith claim becomes ripe, following a decision by the trier of fact on the issue of the breach of contract.

With that understanding in place, the Court deals with the various pieces of evidence the parties seek to admit or exclude in their in limine motions.

### C. MOTIONS IN LIMINE

#### 1. OWL's Motion in Limine - ECF No. 62
*Evidence Not in the Denial Letter*

OWL moves to preclude Hartford from defending against the breach of contract claim using any reason other than those reasons specifically set forth in Hartford's Denial Letter.  In support of this position, OWL cites (1) *Skaling v. Aetna Insurance Company*, 799 A.2d 997, 1011 (R.I. 2002) ("[T]he insurer is limited to introducing evidence that it actually relied upon and communicated to the insured when it denied the claim, and may not seek to enhance its defense by pointing to extraneous facts or arguments that it did not communicate to the insured when it refused payment."); (2) R.I. Gen. Laws § 27-9.1-4(a)(12) (Rhode Island law requires an insurer that denies coverage to "promptly provide a reasonable and accurate explanation of the basis of those actions."); (3) Rhode Island Department of Business Regulations ("DBR") rules on Insurance Claims § 2.7(A) ("No insurer shall deny a claim on the grounds of a specific provision, condition, or exclusion unless reference to such provision, condition, or exclusion is included in the denial."); and (4) the "mend the hold" doctrine.  In response, Hartford argues that it should not be so limited, raising the

8

inequity of OWL being allowed to add to its coverage and damages claims years after the Denial Letter with evidence produced in litigation, but Hartford is restricted in its defense to its Denial Letter without the ability to present any defense to OWL's new claims.[5]

When an insurance company denies coverage and is defending against a breach of contract claim, it should be held to the reasons given to its insured in a denial letter and barred from introducing into evidence or arguing for any grounds that do not appear in the Denial Letter. The Court comes to that conclusion[6] given the state statute requiring an accurate statement of the reasons for the denial, the DBR provision requiring all reasons for rejection of a claim to be in the denial letter, and the "mend the hold doctrine."[7] Allowing an insurance company to later add reasons for its denial would undercut the strong legal obligation requiring insurance

---

[5] The rest of Hartford's arguments relate to the introduction of post-Denial Letter evidence on the bad faith claim, which the Court in this Order bifurcated, so need not address now.

[6] The Court does not adopt OWL's argument that *Skaling* applies here. In *Skaling*, the Rhode Island Supreme Court's rationale was specific to a bad faith and therefore should be limited to that cause of action. *Id.*, 799 A.2d at 1010-11.

[7] The Court believes that the "mend the hold" doctrine is applicable to this case. The United States Supreme Court in *Ohio & Mississippi Railway Company v. McCarthy* held that "[w]here a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold." 96 U.S. (6 Otto) 258, 267-68 (1877). The "mend the hold" doctrine limits a contracting party's defenses for nonperformance to those based on explanations given at the time of the nonperformance. Robert Sitkoff, Comment: *"Mend the Hold" and Erie: Why an Obscure Contracts Doctrine Should Control in Federal Diversity Cases*, 65 U. Chi. L. Rev. 1059, 1068-1069 (1998). While Rhode Island has not explicitly adopted this doctrine, other courts have, and this Court believes that the Rhode Island Supreme Court would if faced with the same facts as this case.

companies to give the insured a complete, accurate, and thorough list of reasons for denying coverage. Insurance companies know how to reserve rights while they investigate claims. Insureds have a right to rely on the facts and reasons given by the insurance company in the denial letter after it has thoroughly investigated the claim.

The Court GRANTS OWL's Motion in Limine to preclude Hartford from introducing at trial evidence and arguments in support of its coverage denial other than the evidence and grounds in the Denial Letter. ECF No. 62.

## 2. Hartford's Motion in Limine – ECF No. 63

### a. Documentation Not Produced Before the Denial Letter

The first issue Hartford raises in its motion is that OWL should be barred from introducing evidence in support of its breach of contract and damages claims if OWL failed to provide Hartford with the evidence before Hartford issued its denial of coverage. Hartford asserts that OWL should be limited at trial to presenting evidence of its claims that it provided to Hartford in 2011 during the claim investigation and before Hartford issued its Denial Letter. In contrast, OWL argues that the post-denial evidence is essential to proving its damages. OWL acknowledges that it did not produce all relevant documents during Hartford's investigation, but in its defense, asserts that in some cases it was unable to because they were lost in the storms.

The issue of when OWL turned the documents over to Hartford is not relevant to the breach of contract claim – although it may be relevant when the bad faith claim

10

is adjudicated.   An insurance company is always required to consider new or supplemental information it receives in deciding whether it should pay a claim and how much it should pay—this obligation does not end with a denial letter or litigation. *See Sinclair v. Zurich Am. Ins. Co.*, 129 F. Supp. 3d 1252, 1257 (D.N.M. 2015) ("[A]n insurer has an obligation to timely reassess its initial decision to deny coverage based upon information received subsequent to the initial decision, even if that information is received after suit is filed."). OWL may introduce any competent relevant evidence in this phase to show a breach of the insurance contract, that OWL had a right to be compensated by Hartford for covered losses, and the extent and value of its damages.[8]

The Court DENIES Hartford's Motion in Limine to exclude evidence of OWL's damage that OWL did not produce before the issuance of the Denial Letter.

The next issue Hartford raises relate to specific terms of the Policy.   Hartford asks the Court to limit OWL's evidence in accordance with these terms.

### b. *Continuing Normal Operating Expenses*

OWL seeks $2,250,000 to recover its "continuing normal operating expenses incurred" as defined by the Policy's Business Income Coverage.  Hartford asserts that OWL seeks reimbursement for expenses that it *would* have incurred if its business had continued to operate without evidence that it actually incurred any of these

---

[8] While Hartford is limited to the reasons in the Denial Letter for the denial of coverage (*see* section III.C.1. above), neither OWL nor Hartford is precluded from presenting evidence post-Denial Letter about the amount that OWL claims for damages from the alleged breach.

11

expenses.   Hartford seeks to exclude and/or limit such evidence to include only expenses OWL *incurred* because of the storms.

The Policy defines this coverage as follows:

**Business Income**

We will pay the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical damage to property at the "scheduled premises," ... caused by or resulting from a Covered Cause of Loss

We will only pay for loss of Business Income that occurs within 12 consecutive months after the date of direct physical loss or physical damage.  This Additional Coverage is subject to the Business Income Specified Limit of Insurance indicated in the Declarations.

ECF No. 63-2 at 9-10.  Critically, the insurance contract defines Business Income as expenses incurred because of an actual loss of income during restoration.  *Id.*  This coverage reimburses "unavoidable continuing expenses during the period of restoration." *Verrill Farms, LLC v. Farm Family Cas. Ins. Co.*, 18 N.E.3d 1125, 1132 (2014).

The plain meaning of the language of the Hartford Policy would lead an insured to conclude that, in the event of a covered loss that caused its business to be suspended, the Policy would cover lost profits and, if there were no lost profits, ongoing expenses incurred during suspension.[9]   OWL was a fledgling company

---

[9] OWL acknowledges that it did not lose any profit and it never incurred these expenses but argues that Hartford should have paid the claim and because OWL's claims were exacerbated because it could not afford to continue its business.  This argument is not relevant to the breach of contract claim but may be made at the time of the bad faith claim is considered.

without a history of regular profits or expenses so when the storms hit its building and property and clipped its wings, it could not and did not continue to operate. The damages that OWL seeks under this category of coverage represents *projected* costs for salaries, employee benefits, communications, data charges, marketing expenses, travel and conferences, professional services, janitorial services, taxes, supplies, utilities, training, and rent. OWL was in business only a couple of months, so it is left to guess about its continuing business and extra expenses.

The Court agrees with Hartford that the plain and unambiguous language in the Policy does not allow OWL to recover continuing operating expenses that it never incurred because it did not keep its business going. The Policy clearly and unambiguously only covers expenses actually incurred. OWL's evidence at trial is limited to expenses it actually incurred both before and after the storms.

The Court GRANTS Hartford's Motion in Limine to exclude evidence of normal operating expenses not actually incurred.

### c. *Extra Expense*

OWL claims $217,187.44 in extra expenses for tenant improvements to space it needed to move to after the storms and seeks coverage under the Policy. However, Hartford seeks to limit OWL's offer of these expenses at trial because OWL never incurred them.

The Policy states that it "will pay reasonable and necessary Extra Expense you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or physical damage to property at the 'scheduled

13

premises,' ..., caused by or resulting from a Covered Cause of Loss."  "Extra expenses"

are incurred:

> (1) To avoid or minimize the "suspension" of business and to continue
> "operations":
>
> (a) At the "scheduled premises;" or
> (b) At replacement premises or at temporary location, including:
> (i) Relocation expenses; and
> (ii) Costs to equip and operate the replacement or temporary
> location, other than those costs necessary to repair or to replace
> damaged stock and equipment.
>
> (2) To minimize the suspension of business if you cannot continue
> "operations."
>
> (3) (a) To repair or replace any property; or
>
> (b) To research, replace or restore the lost information or damaged
> "valuable papers and records;" to the extent it reduces the amount of
> loss that otherwise would have been payable under this Additional
> Coverage or Additional Coverage o., Business Income.
>
> We will only pay for Extra Expense that occurs within 12 consecutive
> months after the date of direct physical loss or physical damage.  This
> Additional Coverage is included in and subject to the Business Income
> Specified Limit of Insurance indicated in the Declarations.

ECF No. 63-2 at 9.

Again, the Policy explicitly contemplates expenses actually incurred.  "Reading

the policy language as a whole, the Policy is unambiguous in its requirement that an

insured suffer 'direct physical loss or damage' to trigger the Extra Expense Clause."

*Phoenix Ins. Co. v. Infogroup, Inc.*, 147 F. Supp. 3d 815, 823 (S.D. Iowa 2015).  Losses

must be reasonable and necessary to avoid suspension of the business or to resume

the business operations as quickly as possible and must be additional to those

ordinarily incurred.  *See Greenspoint Inv'rs, Ltd. v. Travelers Lloyds Ins. Co.*, Civil

Action No. H–10–4057, 2015 WL 965730, at *11 (S.D. Tex. Mar. 3, 2015) ("the Extra Expense provision is only payable under the Policy if the expense was actually incurred").

OWL never signed a lease on a new space and never paid any rent or tenant improvements after the storms. OWL did not actually pay any of these expenses. Thus, the Court GRANTS Hartford's Motion in Limine in that OWL can only present evidence of extra expenses that it actually incurred within the period of restoration defined in the Policy as between September 2011 and September 2012.

### d. Replacement Value

OWL seeks $1,250,000 in coverage for the replacement value of equipment that it claimed was damaged by water that entered the building during the storms. Hartford argues that evidence of these damages should be excluded because the Policy does not provide this coverage unless and until OWL replaces the property and the only evidence OWL has produced is an invoice for $100,000.

Looking to the language of the Policy, it states:

5. Loss Payment
In the event of physical loss or physical damage covered by this policy:
…
d. We will determine the value of Covered Property as follows:
    (1) At replacement cost (without deduction for depreciation) ***
        (b) We will not pay on a replacement cost basis for any physical loss or physical damage:
            (i) Until the physically lost or physically damaged property is actually repaired or replaced; and
            (ii) Unless the repairs or replacement are made as soon as reasonably possible after the physical loss or physical damage ***
        (c) We will not pay more for physical loss or physical damage on a replacement cost basis than the least of:

(i) The cost to replace, on the same premises, the physically lost or physically damaged property with other property of comparable material and quality and which is used for the same purpose; or

(ii) The amount you actually spend that is necessary to repair or replace the physically lost or physically damaged property.

ECF No. 63-2 at 3-4.  Thus, if OWL can show the necessary "direct physical loss of or physical damage to" its equipment, it must be limited to showing the actual cash value of the equipment, not the replacement value unless OWL can show that it replaced or repaired the equipment as soon as possible after the storm damage. Therefore, the Court GRANTS Hartford's Motion in Limine concerning replacement costs for property damage in that the Court limits OWL's evidence as stated here.

## IV.   CONCLUSION

The Court GRANTS OWL's Motions in Limine.  ECF No. 62.  The Court GRANTS IN PART AND DENIES IN PART Hartford's Motion in Limine as explained in this Order.  ECF No. 63.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
Chief Judge
United States District Court

March 11, 2021